UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA

**Hon. Hugh B. Scott**

09CR313S

**Report
&
Recommendation**

v.

Shawn Washington,
Lamar Washington, and
Rodney Johnson Jr.,
                          Defendants.

Before the Court are the following motions: defendant Rodney Johnson's omnibus

motion (Docket No. 27); defendant Lamar Washington's omnibus motion (Docket No. 29);

defendant Shawn Washington's motion to join co-defendants' motions (Docket No. 28); and

defendant Lamar Washington's motion to join in co-defendants motions (Docket No. 32). This

Report & Recommendation deals with the motions to the extent they seek suppression of

evidence or statements. The remaining discovery issues are the subject of a separate Decision &

Order.

**Background**

On November 25, 2009, the Grand Jury for the Western District of New York issued a

superceding indictment charging Shawn Washington, Lamar Washington, and Rodney Johnson

Jr. with conspiracy to possess and distribute cocaine in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(A). (Docket No. 20). In addition, Shawn Washington is charged with two counts of possession, with the intent to distribute cocaine, on August 29, 2009 (Count 2) and September 2, 2009) (count 3) in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(C). (Docket No. 20).

The charges stem from the stop and inspection of a truck driven by defendant Rodney Johnson in the State of Louisiana on October 31, 2007.


**Discussion**

A suppression hearing was commenced on December 9, 2010. Sargent Shannon Lavergne ("Lavergne") of the Louisiana State Police testified at the hearing. On October 31, 2007, Lavergne was assigned to a weigh station for commercial tractor trailers located on Interstate Highway 10 ("I-10") at the eastbound scales in Breaux Bridge, Louisiana. (Docket No. 46 at pages 5-6). When the weigh station is open, signs on the highway compel commercial trucks to enter the weigh station for an inspection. (Docket No. 46 at pages 7-8). According to Lavergne, the purpose of this weigh station is to make sure that all commercial vehicles traveling on the Louisiana Highway are in compliance with the federal law, as well as Louisiana law. (Docket No. 46 at page 7).

Defendant Johnson entered the weigh station at approximately 4:00 a.m. on October 31, 2007. After the truck was weighed, additional signage directs drivers to proceed for an inspection.[1] Lavergne approached the truck, stepped up on the running board and asked Johnson

---

[1] According to Lavergne, once a truck is weighed, the enforcement officer would approach the truck and interview the driver. (Docket No. 46 at pages 9-10). The enforcement officer is authorized to conduct three types of inspections. A level one inspection would be a full

to produce his log book.[2] (Docket No. 46 at page 14). Lavergne testified that he follows this procedure with respect to all trucks that come into the weigh station. (Docket No. 46 at page 47). Lavergne testified that upon inspecting the log book, he noticed that the required entries were incomplete for the last couple of days. (Docket No. 46 at page 14). Based upon these observations, Sargent Lavergne asked the defendant to pull into the parking area for a further inspection. (Docket No. 46 at page 14). During his continued inspection in the parking area, Lavergne noticed that the defendant's log book had missing entries relating to mileage and locations. (Docket No. 46 at pages 14-15). According to Lavergne, the incomplete log book constituted a violation of the Federal Regulations. (Docket No. 46 at pages 19-20). Lavergne

---

inspection of the motor carrier vehicle and an interview of the driver. The enforcement officer, during a level one inspection, would check the driver's license, medical certificate, and log book, to make sure he is logging the required hours and not over on his driving time or rest time. (Docket No. 46 at page 10). If the driver is not in compliance, the law enforcement officer can declare him "out of service" and prevent him from continuing driving on the highway. (Docket No. 46 at page 13). Lavergne stated that, if needed, the enforcement officer is authorized to inspect the inside of the vehicle for compliance in all aspects. (Docket No. 46 at pages 10, 33). Thereafter, the enforcement officer, at his discretion, can conduct a "walk around" inspection of the vehicle to check the equipment on the truck, including the lights, the bumper, windshield, and under carriage of the truck. (Docket No. 46 at page 10). A level two inspection, would entail the same type of inspection as a level one inspection, however, the enforcement officer would not inspect the undercarriage of the truck. Whereas, a level three inspection, would only involve a checking of the driver's credentials to make sure he has all the proper paperwork and fees. (Docket No. 46 at pages10-11). Lavergne testified that the level of inspection that enforcement officers conducts is discretionary and based upon what is occurring, at that time, at the weigh station. (Docket No. 46 at page 11).

[2] Lavergne testified that the purpose of this book is to ensure that the driver is not driving more than the maximum amount of hours that he is enabled to by law. (e.g. 11 hours). (Docket No. 46 at page 13). A driver must make entries in the log book to document the actual hours he was driving and to document his status. If the driver does not accurately reflect the hours of driving, as well as rest, he can be summoned a ticket for violation and placed "out of service" until he complies with the amount of rest required by law. (Docket No. 46 at page 13).

also asked Johnson to produce identification. The defendant produced a Georgia driver's license and a medical card in the name of Rodney Johnson. (Docket No. 46 at page 20). Lavergne also noticed that the name on the truck was S & D Delivery Plus, Express Deliveries, Buffalo, New York, 14215 ("S&D")(Docket No. 46 at pages 22-23).[3] Lavergne testified that he uses a computer in his vehicle to check registrations, driving records, operating authorities and other documentation. (Docket No. 46 at page 24). While he is doing so, Lavergne stated that he invites, but does not compel, the drivers to sit in his vehicle and engages them in conversation. (Docket No. 46 at pages 23-25). Johnson sat in Lavergne's police unit while Lavergne ran records checks on the defendant. (Docket No. 46 at page 24).[4] While the two were in the police car, Lavergne asked Johnson questions regarding where he was heading, and where he was coming from.(Docket No. 46 at page 24). According to Lavergne, some of the statements being made by Johnson did not seem "logical" or did not make "business sense." (Docket No. 46 at page 25). Lavergne testified that Johnson told him that he had only been with D&D for two weeks. (Docket No. 46 at page 25). Lavergne asked the defendant where he was coming from and the defendant allegedly stated that he was off duty visiting friends in Houston for the past seven days. (Docket No. 46 at page 25). Lavergne stated that he asked Johnson how many trucks S&D had, and Johnson allegedly stated that S&D had two trucks, but that they were having problems with the other truck which was "back in the yard." (Docket No. 46 at page 25).

---

[3] The truck was registered to Shawn Lamar Washington. (Docket No. 46 at page 43).

[4] Lavergne stated that he does not recall if Johnson sat in the front seat or the rear seat of the patrol vehicle as they talked. (Docket No. 46 at page 64). He testified that Johnson was "in and out" of the truck and the patrol car several times during the course of the inspection. (Docket No. 46 at pages 61, 64, 66)

Lavergne stated that he questioned why D&D would let Johnson take their only working truck to go visit friends in Houston when he had only been with the company for two weeks. He asked Johnson how the company could make money having their only truck "down" for an entire week." (Docket No. 46 at page 26).  According to Lavergne, Johnson had no explanation. (Docket No. 46 at page 26).

Lavergne testified that his suspicions grew because in his training he had been advised that Houston was a hub for shipments of illegal narcotics. (Docket No. 46 at page 29).  Lavergne stated that Johnson had also told him that he was planning on stopping in Atlanta on they way home.  According to Lavergne, he had been advised that Atlanta was also a narcotics hub. (Docket No. 46 at page 29).  Lavergne testified that he noticed that the defendant started to become nervous, continually stating "is everything OK?", "is anything wrong,"[5] as he kept moving about "dancing" and stretching, repeating himself with a "crackling" voice. (Docket No. 46 at pages 26, 40). He decided to run a criminal history check on Johnson, and asked Johnson if he had ever been arrested before.  Johnson allegedly told Lavergne that he had been arrested in the past for some "childish things." (Docket No. 46 at page 27).[6]

Lavergne stated that he felt something "wasn't right" (Docket No. 46 at page 26). While he was continuing the interview and inspection, at approximately 4:22 a.m. Lavergne called

---

[5]  Lavergne testified that he thought that there was a problem, but continued to tell Johnson "no" when he asked because of safety concerns. (Docket No. 46 at page 99).

[6]  According to Lavergne, the defendant's criminal history record which appeared on the computer in the trooper's vehicle, reflected arrests for theft, battery and weapons violations. (Docket No. 46 at page 27). On cross-examination, Lavergne testified that he had just been informed on the day of the suppression hearing that Johnson had not been convicted of these charges. (Docket No. 46 at page 76).

another trooper to get assistance and to see if a K-9 unit was in the area.[7]  Lavergne continued the

inspection of the truck. (Docket No. 46 at pages 27, 30).  At one point, to assist with the

inspection, Johnson got into the driver's seat of the truck to turn on the lights, signals, wipers,

and operate safety equipment at Lavergne's direction. (Docket No. 46 at page 32).  Lavergne

asked Johnson for consent to search the truck, but Johnson refused. (Docket No. 46 at page 31).

Lavergne stated that he had completed the inspection, except for an inspection of the sleeper

berth, and returned to his police vehicle at "about the time of the K-9's arrival" along with an

additional trooper. (Docket No. 46 at page 31).[8]  Lavergne stated that he wanted to wait for the

K-9 before inspecting the sleeper berth. (Docket No. 46 at pages 32-33).  Lavergne summarized

the basis for his suspicions regarding Johnson:

> It is like pieces of a pie.  It was the fact that the individual told me
> he had only been with the company for two weeks and that they
> allowed him to stay seven days with the only truck they had in
> Houston, to visit friends; that he couldn't tell me who they were;
> that he brought a set of bed rails to Dallas, which he did not have a
> Bill of Lading for; which is how they pay each other when they do
> commerce and the fact that the company makes money by [keeping
> the truck] rolling. I couldn't see him staying with that truck for that
> period of time.  It was the fact that he had incomplete entries in the
> log, which told me that he wasn't doing a good job with his log or
> he hadn't been driving very long and didn't understand the
> logbook.  It was the fact that he appeared nervous when he spoke
> as we progressed. It was the fact that he refused consent for a
> search after he clearly told me that he had nothing illegal or

---

[7]  Lavergne testified that he requested an additional trooper approximately 12 minutes
after he initiated his contact with Johnson; and that he requested a K-9 unit approximately 22
minutes after the initiation of contact with Johnson.  (Docket No. 46 at page 68). Lavergne states
that he made these requests prior to Johnson's refusal to consent to a full search of the truck.
(Docket No. 46 at page 67).

[8]  Lavergne testified that he and Johnson "went back and forth" between Lavergne's
vehicle and the truck during the course of the inspection. (Docket No. 46 at page 64).

> nothing to hide. It was the fact that he deemed his criminal battery
> charge – there was nothing childish about that. It was all of it
> together.

(Docket No. 46 at pages 73-74). Lavergne testified that he "suspected criminal activity. ... But it could have been anything. It could have been a load of counterfeit merchandize. It could have been that he committed some type of crime before. Something – something wasn't right." (Docket No. 46 at page 84).

Chase M. Guidry was the K-9 handler that responded to Lavergne's call with a dog named "Drake." (Docket No. 55 at pages 146, 155). After speaking with Lavergne, Guidry walked Drake around the truck. Lavergne testified that Johnson appeared to become "more nervous" after the dog arrived at the scene. (Docket No. 46 at page 79). According to Lavergne, the dog alerted at the passenger's side door, between the bottom of the door and the fuel tank. (Docket No. 46 at page 36). Guidry brought the dog around again, and the dog again alerted at the same spot. (Docket No. 46 at page 37).

After Drake alerted, Lavergne, Guidry and Drake entered the cab of the truck and searched the vehicle. (Docket No. 46 at pages 39-40; Docket No. 155 at page 161). Lavergne testified that he noticed a flat-screen television mounted in front of a little "cubby" normally used to store things on the passenger side of the vehicle.[9] Lavergne stated that the television appeared to have been installed after the original manufacturing of the truck, as it was not a standard setup for a freight liner. (Docket No. 46 at page 39). Lavergne was able to use a flashlight to see behind the television, and observed "square bundles wrapped in duct tape." (Docket No. 46 at

---

[9] According to Lavergne, the television was between four or five feet above where the dog alerted. (Docket No. 46 at page 106).

7

page 39). He immediately believed the duct-taped bundles to be "contraband narcotics." (Docket No. 46 at page 40). Lavergne then handcuffed Johnson, read him his rights and advised him that he was under arrest for "possible narcotics." (Docket No. 46 at page 40). Lavergne testified that he did not have reasonable suspicion that Johnson had committed a "specific crime" until he looked behind the television. (Docket No. 46 at page 110).

Johnson and the truck were transported, separately, to a Louisiana State Police facility. (Docket No. 46 at page 41). Lavergne did not question Johnson further. (Docket No. 46 at page 42). Lavergne did issue an inspection report to Johnson stating that the inspection revealed violations of federal regulations relating to incomplete entries in the driver's log and possession of prohibited drugs. (Docket No. 46 at pages 44-45). The truck was then searched by Louisiana State Trooper Mitchell Fontenot, and other troopers.[10] They had to pry the television away from the opening (Docket No. 46 at page 125). Within the compartment, approximately eight (8) bundles of powder cocaine were found hidden behind the flat screen TV. (Docket No. 46 at page 122). In addition to the cocaine, Fontenot found a Home Depot bag containing the components and tools that were believed to be used to fabricate the compartment behind the flat screen TV. (Docket No. 46 at page 126).

Guidry also testified at the suppression hearing. He stated that on October 31, 2007, he was employed with the St. Martin Parish Sheriff's Office in Louisiana. (Docket No. 55 at page 145). He had recently been assigned to become a K-9 handler. Drake, a 9 year old chocolate lab, was assigned to him. According to Guidry, Drake had been used by the St. Martin Parish

---

[10] Fontenot testified that he read Johnson his rights again and attempted to interview him, but Johnson stated that he wanted an attorney and the interview was concluded. (Docket No. 46 at page 121).

Sheriff's Office as a narcotics dog for several years prior to being matched with Guidry.  (Docket No. 55 at page 147).Guidry stated that Drake had previously been certified by United States K-9 Unlimited ("US K-9") nine years prior and that Drake was re-certified by an instructor from the National Narcotics Detector Dog Association ("NNDDA") every year prior to Drake being assigned to Guidry (Docket No. 55 at pages 149, 172).  In addition, Guidry testified that he and Drake completed a 150-hour training program offered by US K-9 and were certified as a team on October 4, 2007. (Docket No. 55 at pages 146-151; Government's Exhibit 17).   Guidry stated that Drake lived with him and that they trained every day on both obedience and narcotics detection. (Docket No. 55 at pages 153-154). Guidry acknowledged that he did not "get to use [Drake] in the field much before" the incident underlying this case. (Docket No. 55 at page 153). Guidry testified that he was only a dog handler for 6-months before he left the St. martin Parish Sheriff's Office. (Docket No. 55 at page 167-168). He stated that Drake was an "outstanding" dog and that he never had any false alerts during his time with him. (Docket No. 55 at page 155).[11] Guidry acknowledged that he was not familiar with Drake's performance history prior to the time they were matched. (Docket No. 55 at page 182). Guidry testified that he remembered the October 31, 2007 incident "very distinctly" because it was the largest "drug bust" he had ever made. (Docket No. 55 at page 155). He stated that when he arrived he spoke with Lavergne who advised him that Johnson's explanation regarding his use of the truck did not make business

---

[11]   At some point subsequent to October 31, 2007, Drake died (his date of death is not in the record). (Docket No. 55 at page 175).  According to Guidry, the St. Martin Parish Sheriff's Office disposed of Drake's file after the dog died. The reports generated as a result of searches performed by Drake still exist in the individual case files. It appears that the documents in Drake's disposed file would have allowed the identification of the cases in which Drake was utilized, however, without those documents, there is no efficient way of searching for cases in which Drake may have been utilized. (Docket No. 55 at page 175).

sense. (Docket No. 55 at page 157). Guidry stated that he observed that Johnson was "pretty nervous" and that he was doing what Guidry referred to as the "felony jig" [moving his weight on the balls of his feet] and that Johnson's nervousness became "exacerbated" as Drake was taken out of the car. (Docket No. 55 at page 158). Guidry stated that he started at the rear of the truck and walked Drake around the vehicle. According to Guidry, Drake gave a strong aggressive alert at the seam of the passenger side door. (Docket No. 55 at page 158). Guidry stated that he praised Drake, but did not reward him at that time. He pulled Drake away from the truck [to get Drake off the scent], then went back to complete a search around the vehicle. (Docket No. 55 at page 159). Guidry stated that he then did a second search pattern, again starting at the rear of the truck. Guidry testified that Drake again gave a "very, very strong aggressive" alert at the passenger side door indicating the presence of narcotics inside the vehicle. (Docket No. 55 at page 160). Guidry stated that he still did not reward Drake, just in case there were not any narcotics in the truck because he did not want to provide positive reinforcement for a possible false alert. (Docket No. 55 at pages 160-161). After the second alert, Guidry advised Lavergne that Drake gave a positive alert for narcotics inside the vehicle. (Docket No. 55 at page 161). Lavergne, Guidry and Drake then entered the cab of the truck, Drake gave an alert on some personal items that were in a cubby just under the television which is on the passenger side of the truck consistent with the location of Drake's alerts on the outside of the truck. (Docket No. 55 at pages 161-163).[12] After prying the television somewhat, Lavergne and Guidry discovered eight duct-taped wrapped bricks inside behind the television. (Docket No. 55 at page 162).

---

[12] Guidry testified that in the course of his training he was taught that the scent of cocaine sinks, while the scent of marijuana rises. (Docket No. 55 at page 162).

The defendant called Dr. Lawrence J. Meyers as an expert witness at the suppression hearing on behalf of the defendant. Meyers holds a Doctorate of Veterinary Medicine from Mississippi State University; a masters degree in zoology; and a Ph.D. in neurophysiology from Oklahoma State University. (Docket No. 62 at page 5). He is currently an associate professor at the College of Veterinary Medicine at Auburn University, in Auburn, Alabama. (Docket No. 62 at page 4). In addition to teaching at Auburn, Meyers has consulted with several federal agencies regarding canine breeding and detection programs, and has previously been accepted as an expert in the field of canine detection and handling. (Docket No. 62 at pages 7-8; Defendant's Exhibit D). Meyers testified that the records he received were not sufficient to allow him to determine the adequacy of the training of the dog/handler team. (Docket No. 62 at page 12). According to Meyers, the St. Martin Parish Sheriff's Office's own policy indicated that their dog/handler teams should be certified by the NNDDA. (Docket No. 62 at page 13).[13] Meyers testified that there are several organizations that have canine narcotics detection certification programs including the California Canine Association, the United States Canine Police Association, the North American Police Working Dog Association. He said that the programs were similar to the NNDDA. (Docket No. 62 at page 16). Meyers testified that he was not familiar with the US K-9 program, but noted that its "paperwork" indicated that they follow the NNDDA procedures. (Docket No. 62 at page 19). However, without more information, Meyers stated that he cannot

---

[13]    It appears undisputed that the *team* of Guidry and Drake was certified by US K-9 and not the NNDDA. The defendant has submitted documentation from the NNDDA stating that Guidry was never certified by that agency. (Defendant's Exhibit E). Those documents do not address whether Drake was previously certified by the NNDDA prior to being assigned to Guidry (as so testified to by Guidry).

offer an opinion as to the US K-9 certification program. (Docket No. 62 at pages 19, 26).[14] Meyer also testified that these are "voluntary associations" that test whether the dog/handler team can perform several exercises successfully, and that most, including the NNDDA, ***do not*** test for reliability, which requires repeated measurements. (Docket No. 62 at page 17). Meyer further acknowledged that a certification does not mean that the dog is reliable or unreliable. (Docket No. 62 at page 51). He did state that he believed that US K-9 had a conflict of interest inasmuch as they were also purportedly the agency that originally trained and sold Drake to the St. Martin Parish Sheriff's Office. (Docket No. 62 at page 20).

Meyers also testified that there may have been a problem in the manner in which Guidry conducted the search on October 31, 2007 because he spoke with Lavergne prior to walking Drake around the truck. Meyers suggests that Drake would pick up on any suspicions that Lavergne and Guidry may have had, and that this could increase the probability of a false alert. In this regard, Meyers testified that "if a person looks for just a fraction of a second longer at one spot than another, dogs almost invariably will go to investigate that spot." (Docket No. 62 at pages 23-24). He stated that it increases the "probability of the dog to engage in an alert whether or not there in fact are any narcotics present because that is the expectation of the handler and displayed to the dog by the handler's behavior." (Docket No. 62 at page 56). Meyers states that

---

[14]    In order "to show efficacy and meeting the standards of training" he should have received "a curriculum that the dog and the handler team went through initially and that should have come from the academy mentioned. There should have been daily records and comments regarding the progression of training of both the dog and the dog handler team. And further, there should be a set of records showing maintenance training. For instance, a dog handler team cannot just be set forth and just pulled off the shelf whenever and be presumed to work properly. So, there should be at least a weekly training log showing a maintenance training indicating conditions, finds, how they were placed, where they were placed and so forth, those were not available." (Docket No. 62 at pages 20-21).

Lavergne should not have expressed any suspicions he had regarding the truck to Guidry. (Docket No. 62 at page 23). Meyers acknowledged that in this case there was no false alert and that any unintentional influence by the handler did not create the odor for the dog. (Docket No. 62 at pages 54-55). Further, Meyers acknowledged that the testimony of the conversation between Lavergne and Guidry did not reflect that Lavergne told Guidry that he suspected drugs in this case, but only that there was contraband present. (Docket No. 62 at pages 61-62). Meyers also stated that Guidry should not have praised Drake after his alert on the first round, and that doing so meant that Drake's alert on the second round was not confirmatory of anything. (Docket No. 62 at page 25). To confirm the alert, Meyers suggested that they would have had to use another dog/handler team. (Docket No. 62 at page 66). Finally, Meyers stated that he found Guidry's testimony that Drake never had a false alert to be suspect, but acknowledged that Guidry's testimony could be true. (Docket No. 62 at page 31, 32). Meyers admitted that he is not a very experienced dog handler and that he has never worked in law enforcement other than in training and certification programs. (Docket No. 62 at page 37). Meyers testified that he believed that Drake was originally named "Dego" but that his named was changed because "Dego" could be construed as being offensive. (Docket No. 62 at page 15). On cross-examination, Meyers acknowledged that, other than his testimony, there was no other testimony suggesting Drake was originally named "Dego" and admitted that he might have confused two different cases. (Docket No. 62 at page 39).

**The Stop, Search and Arrest**

Johnson argues that the warrantless search of the truck was unlawful. (Docket No. 40 at page 4). Warrantless inspections of commercial trucks have been upheld as long as the statutory scheme complies with <u>New York v. Burger</u>, 482 U.S. 691 (1987). To comply with <u>Burger</u>, three elements must be met. First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made. ... Second, the warrantless inspections must be necessary to further the regulatory scheme. <u>Burger</u>, 482 U.S. at 702. Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. <u>Burger</u>, 482 U.S. at 703. The parties have not cited any authority relating to the Louisiana statutory scheme providing for such inspections in this case. The Fifth Circuit has held that generally similar statutory schemes in Mississippi and Texas comply with <u>Burger</u>. See <u>United States v. Castelo</u>, 415 F.3d 407 (5th Cir 2005); United States v. Fort, 248 F.3d 475 (5th Cir. 2001). The Sixth Circuit has held similarly with respect to Kentucky's statutory scheme. <u>United States v. Dominguez–Prieto</u>, 923 F.2d 464 (6th Cir.1991). The Second Circuit has also held that state statutory schemes justify an administrative search exception. In <u>United States v. Navas</u>, 597 F.3d 492, 501 (2d Cir. 2010), the Second Circuit held:

> Moreover, any expectation of privacy that defendants may have harbored in the trailer was significantly diminished by the "pervasive schemes" of state and federal regulation to which it was subject. ... [California v.] Carney, 471 U.S. 386, 392, 105 S.Ct. 2066; *cf.* <u>New York v. Burger</u>, 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (reasoning that expectations of privacy are "particularly attenuated in commercial property employed in 'closely regulated' industries"). Several of our sister circuits have held that the interstate commercial trucking industry is pervasively

14

regulated to an extent that justifies a warrantless administrative search of a tractor trailer. *See, e.g.,* United States v. Delgado, 545 F.3d 1195, 1201-02 & n. 3 (9th Cir.2008). Although the foundation for the administrative search exception to the warrant requirement is entirely distinct from the rationales underlying the automobile exception, the discussion of the applicable regulatory structures in this authority is instructive. Based on the nature and scope of the regulations relating to the commercial trucking industry, we are persuaded that defendants' reasonable expectations of privacy in the trailer were minimal. Therefore, the reduced-privacy rationale provides further support for our conclusion that the warrantless search of this inherently mobile trailer was reasonable under the Fourth Amendment.

Navas, 597 F.3d at 501.

Johnson has not challenged the legal authority to stop, weigh, and conduct administrative inspections of commercial vehicles pursuant to the federal and Louisiana State statutory schemes cited by the government in this case. Thus, further analysis of the Louisiana statutory scheme is not necessary in this case. Lavergne's conduct in inspecting the truck and Johnson's log book pursuant to the federal and state regulatory scheme did not constitute an impermissible stop. The record also reflects that it was reasonable for Lavergne to suspect that illegal activity might be afoot based upon Lavergne's inspection of Johnson's log book, the fact that the defendant's statements relating to the utilization of the truck lacked business sense, the lack of any bills of lading, and Lavergne's observations of Johnson's nervousness. Based upon this reasonable suspicion, further investigation was warranted. See United States v. Riley, 684 F.3d 758, 761-762 (8th Cir. 2012)(trooper had reasonable suspicion to call for drug dog after pulling car over for traffic infraction where driver was nervous and provided inaccurate answers to questions).[15] It

---

[15] In Riley, a Missouri state trooper pulled over a vehicle after observing it cross the center line. The trooper contacted the driver at his car, asked for his driver's license and then

was not impermissible for Lavergne to call for the assistance of a drug detection dog. In <u>Illinois v. Caballes</u>, 543 U.S. 405, 409 (2005), the Supreme Court held that because there is no legitimate interest in possessing illegal substances; the use of a reliable drug-detection dog, which does not expose the presence of legal substances or other items in which there is a legitimate privacy interest, generally is not a search that implicates the Fourth Amendment.

Johnson also acknowledges that the "automobile exception" allows the government to conduct a warrantless search of a vehicle where there is probable cause to believe it contains contraband without violating the Fourth Amendment. (Docket No. 40 at page 5). <u>Navas</u>, 597 F.3d at 497 citing <u>Pennsylvania v. Labron</u>, 518 U.S. 938, 940 (1996). Where the probable cause upon which the search is based "extends to the entire vehicle," the permissible scope of a search pursuant to this exception includes " 'every part of the vehicle and its contents [including all containers and packages] that may conceal the object of the search.' " <u>United States v. Harwood</u>, 998 F.2d 91, 96 (2d Cir.1993) (alteration in original) (quoting <u>United States v. Ross</u>, 456 U.S.

---

asked the driver to accompany him to his patrol car so that the trooper could run a records check. The driver complied. Once in the patrol car, the trooper began to ask the driver questions about his travel itinerary. The driver indicated that he had been driving from the Hard Rock Casino near Tulsa, Oklahoma. During the course of their exchange, the trooper observed that the driver seemed very nervous, his heart rate appeared to be elevated and he was also fidgeting, and his breathing appeared to be shallow and rapid. When the trooper asked why he appeared so nervous, the driver indicated he had never been put in the backseat of a police vehicle during a routine traffic stop. The trooper asked the driver whether he had ever been in trouble before, the driver represented that he had been arrested once for domestic battery. However, the trooper then received information from dispatch that the driver had a criminal history of several drug violations and several felony arrests, including arrests for assaulting law enforcement. The trooper advised the driver that he believed the driver was lying and asked for consent to search his car. The driver refused. The trooper requested the assistance of a drug detection dog. The drug dog twice alerted to the presence of drugs in the trunk. The officers then searched the trunk and found approximately one kilogram of cocaine. <u>Riley</u>, 684 F.3d at 761-762.

798, 825 (1982)); *see also* <u>California v. Acevedo</u>, 500 U.S. 565, 580 (1991).

Further, Johnson admits that "an alert by a trained canine establishes probable cause to search." (Docket No. 40 at page 5 citing <u>United States v. Waltzer</u>, 682 F.2d. 370, 373 (2d. Cir. 1982)). It is undisputed that Drake, the drug dog utilized in this case, alerted indicating the presence of narcotics inside the truck. The defendant argues, however, that Drake was not properly certified or reliable. The defendant acknowledges that there is no requirement in the Second Circuit that the dog's complete credentials and history be set forth, but that there should be "at least an attestation to the dog's training or reliability." (Docket No. 66 at page 12 citing <u>United States v. Cortez</u>, 1995 U.S. Dist. Lexis 10042 (S.D.N.Y. 1995)). As discussed above, the record in this case includes a certification that Drake and Guidry successfully completed a 150-hour training program in narcotics detection and was certified by US K-9. (Docket No. 55 at pages 146-151; Government's Exhibit 17). Guidry further testified as to Drake's reliability and that Drake had been used by the St. Martin Parish Sheriff's Office as a narcotics dog for several years prior to being matched with Guidry (Docket No. 55 at page 147), that Drake had previously been certified by US K-9, and that Drake was re-certified by an instructor from the National Narcotics Detector Dog Association ("NNDDA") every year prior to Drake being assigned to Guidry (Docket No. 55 at pages 149, 172). Further, Guidry stated that Drake lived with him and that they trained every day on both obedience and narcotics detection. (Docket No. 55 at pages 153-154). Although the defendant's expert, Meyers, testified that he did not have enough information to assess the quality of the US K-9 program, he did not articulate a basis to conclude

that the program was inadequate.[16]  Meyers testified that there were several organizations that

have canine certification programs, and that while he was unfamiliar with US K-9's program, the

US K-9 paperwork indicated that they followed the NNDDA procedures.  (Docket No.  62 at

pages 17-19).   Generally, evidence of a certification that the dog and handler received training in

narcotics detection, along with testimony from the dog's handler as to reliability is sufficient to

establish probable cause.  To establish the dog's reliability, it has been held that an affidavit need

only state the dog has been trained and certified to detect drugs.  *See* United States v. Venema,

563 F.2d 1003, 1007 (10th Cir.1977) (affidavit in support of a search warrant need not describe

the drug-detecting dog's educational background and general qualifications with specificity to

establish probable cause); United States v. Berry, 90 F.3d 148, 153 (6th Cir.) (search warrant

application need not describe the particulars of a dog's training, reference to dog as a "drug

sniffing or drug detecting dog" sufficient to support probable cause), *cert. denied,* 519 U.S. 999,

117 S.Ct. 497, 136 L.Ed.2d 389 (1996); United States v. Klein, 626 F.2d 22, 27 (7th Cir.1980)

(statement that dog graduated from training class and has proven reliable in detecting drugs on

prior occasions sufficient to support probable cause).  United States v. Kennedy, 131 F.3d 1371,

1377 (10th Cir. 1997)(We decline to encumber the affidavit process by requiring affiants to

include a complete history of a drug dog's reliability beyond the statement that the dog has been

trained and certified to detect drugs.);  United States  v. Sundby, 186 F.3d 873, 876 (8th Cir.

1999)(An affidavit need not give a detailed account of the dog's track record or education).  See

---

[16]    Meyers did suggest that a conflict of interest existed inasmuch as US K-9 was the
agency that initially trained and sold Drake to the St. Martin Parish Sheriff's Office. However,
the defendant does not cite to any authority in support of this contention. In any event, this fact,
without more,  is insufficient to call the dog's reliability into question.

also <u>United States v. Villa</u>, 348 Fed.Appx. 376 (10th Cir. 2009)( Dog's reliability was sufficient to provide probable cause based on the dog's proper certification and Deputy Mathes's testimony at the suppression hearing. Considering the dog's proper certification, Deputy Mathes's testimony regarding the dog's reliability, and Ms. Villa's cross examination of Deputy Mathes, we find the district court's refusal to order additional discovery of documentary evidence regarding the dog's reliability was not arbitrary, capricious, or manifestly unreasonable.); <u>United States v. Gonzalez-Acosta</u>, 989 F.2d 384, 388 (10th Cir.1993)(holding that further documentary evidence of a dog's reliability was not necessary because the dog was properly certified and defense counsel had the opportunity to extensively cross-examine the dog's handler); <u>United States  v. Nelson</u>, 309 Fed.Appx. 373 (11th Cir. 2009)(Viewing the evidence in the light most favorable to the Government and considering our previous decision that evidence of a dog's training is sufficient proof of reliability, the district court did not err in the present case in concluding the testimony of an officer about his dog's training, certification, and performance was sufficient proof of the dog's reliability.); <u>United States v. Dillon</u>, 810 F.Supp. 57, 61 (W.D.N.Y.1992) ("formal recitation of a police dog's *curriculum vitae* unnecessary in the context of ordinary warrant applications"); <u>United States v. High Wolf</u>, 2008 WL 3833587 (D.S.D.,2008)(An affidavit stating that the dog has been trained and certified to detect drugs sufficiently establishes a dog's reliability).

Guidry's testimony regarding he and Drake's certification by US K-9, Drake's prior certifications and their continuing training routine adequately establishes the reliability of the drug detection dog utilized in this case.

Johnson also asserts that the manner in which Guidry conducted the search on October 31, 2007 was improper because Guidry spoke with Lavergne prior to walking Drake around the

truck.  In support of this argument, Johnson points to Meyers' testimony that Drake would have sensed any suspicions that Lavergne and Guidry may have had, and that this could have increased the probability of a false alert.  Meyers stated that studies show that handlers may  influence a dog's performance by giving an unintentional cue, for example, by looking at one spot just a fraction of a second longer than another. (Docket No. 62 at pages 23-24).  Meyers testified that if a dog senses that the handler suspects the presence of narcotics, it increases the "probability of the dog to engage in an alert whether or not there in fact are any narcotics present because that is the expectation of the handler and displayed to the dog by the handler's behavior."  (Docket No. 62 at page 56).  Meyers states that Lavergne should not have expressed any suspicions he had regarding the truck to Guidry.  (Docket No. 62 at page 23).  To some extent the interaction involving unintentional cues between a handler and a drug detection dog is difficult to avoid.  It would appear that any dog handler called to conduct a search, particularly a traffic stop search at 4:00 a.m., might reasonably perceive – even without speaking to the officers – that the officers who called for the drug detection dog suspected that the search might reveal drugs.  In any event, Meyers acknowledged that in this case there was no false alert and that any unintentional influence by the handler did not create the odor that made Drake alert.  (Docket No. 62 at pages 54-55).  Further, Meyers acknowledged that the testimony of the conversation between Lavergne and Guidry did not reflect that Lavergne told Guidry that he suspected drugs in this case, but only that there was contraband present. (Docket No. 62 at pages 61-62). Finally, the record reflects that the tractor trailer in this case was a very large vehicle.  There is no evidence to suggest that either Lavergne or Guidry suspected drugs to be found in any particular section of the truck.  The fact that Drake alerted in the proximity of where the cocaine was actually located suggests that

any unintentional cuing caused by the officers' suspicions did not play a material role in this case.

In sum, the record sufficiently reflects the reliability of the drug detection dog utilized in this case for purposes of finding probable cause to search the truck.

## Conclusion

For the reasons stated above, it is recommended that the motion to suppress evidence and statements be denied.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen(14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil

Procedure, and W.D.N.Y. Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3)may result in the District Court's refusal to consider the objection.**

So Ordered.

/s/ Hugh B. Scott
United States Magistrate Judge
Western District of New York

Buffalo, New York
January 3, 2013